723 So.2d 649 (1998)
Ex parte Willson JENKINS, guardian ad litem for minor child J.B.
Ex parte State of Alabama ex rel. C.T.G.
(Re State ex rel. C.T.G. v. M.A.B.; and Guardian ad litem for minor child J.B. v. M.A.B.)
1961520 and 1961531
Supreme Court of Alabama.
July 17, 1998.
*650 R. Willson Jenkins of Jester & Jenkins, P.C., Florence, guardian ad litem for petitioner J.B.
J. Coleman Campbell and Lois Brasfield, asst. attys. gen., Department of Human Resources, for petitioner State ex rel. C.T.G.
No brief filed for respondents.
SEE, Justice.
These petitions concern the reopening of a final judgment of paternity. The trial court allowed a man who had previously been adjudicated the father of a child to proffer deoxyribose nucleic acid ("DNA") evidence indicating that he was not the child's biological father. The trial court reopened the judgment of paternity, pursuant to Ala.Code 1975, § 26-17A-1; entered an order finding the previously adjudicated father not to be the child's biological father; and set aside the earlier order requiring him to pay child support. The Court of Civil Appeals affirmed. State ex rel. C.T.G. v. M.A.B., 723 So.2d 644 (Ala. Civ. App.1997). We granted the petitions of the guardian ad litem and the State for certiorari review. We hold that the previously adjudicated father's action was not barred by the statute of limitations; that he is not entitled to relief under § 26-17A-1 because the statute, if applied retroactively, would violate the separation-of-powers principle, *651 but that he may be entitled to relief under Rule 60(b), Ala. R. Civ. P. Therefore, we reverse and remand.
C.T.G. (the mother) and M.A.B. (the previously adjudicated father) were divorced on October 1, 1984. Immediately following her divorce from M.A.B., the mother learned she was pregnant. The child, J.B., was born six and one-half months after the divorce.
In 1985, the State, on behalf of C.T.G., filed a paternity action, asking the court to declare M.A.B. the father. M.A.B. acknowledged paternity. The paternity judgment became final in 1986. The trial court ordered M.A.B. to pay $25 per week in child support.
In December 1995, the State, on behalf of the mother, petitioned for an increase in child support. M.A.B. responded and sought to reopen the 1986 paternity judgment, pursuant to § 26-17A-1 and Rule 60(b), alleging that he had received information that at the time of conception the mother was engaged in a sexual relationship with another man. After a hearing, the court took the matter under advisement. While the ruling was pending, M.A.B had DNA testing performed on himself and on J.B. The test results excluded M.A.B as the biological father of J.B.; M.A.B. notified the trial court of the test results, and the trial court ordered additional testing, over the objections of both the State and the guardian ad litem for J.B. The subsequent testing also indicated that M.A.B. was not the biological father of J.B. In 1996, the trial court reopened the 1986 paternity judgment, pursuant to § 26-17A-1, and then held that M.A.B. was not the father and was not liable for child support. The Court of Civil Appeals affirmed. In their petitions for certiorari review, the State and the guardian ad litem make numerous arguments; those arguments are best understood in the context of the history leading up to the enactment of § 26-17A-1.

I. Background
In 1984, the Alabama Legislature passed the Alabama Uniform Parentage Act. Ala. Acts 1984, Act No. 84-244, p. 375 (codified as amended at Ala.Code 1975, § 26-17-1 to -22). Section 26-17-5(a)(1) creates a presumption of paternity between a man and a child born during the man's marriage to the child's mother or born within 300 days after the termination of the marriage. Section 26-17-5(b) provides that a presumption of paternity can be rebutted in an action by "clear and convincing evidence" that the presumed father is not the biological father.
Until 1994, if an action to establish the existence of a presumed paternity relation had been reduced to a final judgment subject to the principles of res judicata, the presumed father could ask a court to reopen that final judgment only under Rule 60(b), Ala. R. Civ. P. Under Rule 60(b)(6), Alabama courts allowed a previously adjudicated father, who obtained blood test evidence or DNA evidence indicating that he was not the biological father, to reopen a final judgment of paternity. The previously adjudicated father, however, was required to make his motion to reopen the final judgment within a "reasonable time" after discovering reason to doubt his paternity. See, e.g., K.W. v. State ex rel. S.G., 581 So.2d 855 (Ala.Civ.App.1991) (holding that a previously adjudicated father could challenge a 4-year-old paternity judgment because he acted within a "reasonable time" of learning that he might not be the father); Ex parte State ex rel. McKinney, 567 So.2d 366 (Ala.Civ.App.1990) (holding that a previously adjudicated father could challenge a 12-year-old paternity judgment because he challenged it within a "reasonable time" after learning of his sterility). In 1993, however, this Court denied Rule 60(b)(6) relief to a man who challenged a 9-year-old paternity judgment with DNA evidence that showed he was not the biological father. Ex parte W.J., 622 So.2d 358, 360 (Ala.1993). Because the man had had reason to doubt his paternity at the time of the original proceeding, but had failed to act within a "reasonable time," the previous paternity judgment was res judicata. Id. at 362.
In 1994, apparently in reaction to this Court's denial of relief in W.J., supra, on res judicata grounds, the Legislature enacted § 26-17A-1. See City of Birmingham v. Hendrix, 257 Ala. 300, 307, 58 So.2d 626, 633 (1952) (stating that in attempting to discern *652 the legislative intent of a statute, it is permissible to examine the law as it existed before the statute was enacted). Section 26-17A-1 provides in pertinent part:
"(a) Upon petition of the defendant in a paternity proceeding where the defendant has been declared the legal father, the case shall be reopened if there is scientific evidence presented by the defendant that he is not the father. The court shall admit into evidence any scientific test recognized by the court that has been conducted in accordance with established scientific principles or the court may order a blood test, or a Deoxyribose Nucleic Acid test of the mother, father, and child. Whenever the court orders a test and any of the persons to be tested refuse to submit to the test, the fact shall be disclosed at the trial, unless good cause is shown."
(Emphasis added.)[1] Under § 26-17A-1(a), a previously adjudicated father can petition for a reopening of the final judgment of paternity, without regard to the "reasonable time" requirement of Rule 60(b)(6), if he presents scientific evidence indicating that he is in fact not the biological father. Of course, the trial court must determine that the evidence is indeed scientifically valid and therefore reliable. See generally Turner v. State, [Ms. 1952024, January 16, 1998] ___ So.2d ___ (Ala.1998) (discussing the definition of "scientific" evidence).

II. Statute of Limitations
The State contends that the reopening procedure of § 26-17A-1 is not available to M.A.B., because, it argues, the five-year limitations period of § 26-17-6(a), a part of the Alabama Uniform Parentage Act, bars this action to establish the nonexistence of paternity presumed under § 26-17-5(a)(1). We disagree.
Section 26-17-6(a) provides that a mother, a child, or a presumed father may, within five years of the child's birth, bring an action to establish the "existence" of the paternity relationship presumed under § 26-17-5(a)(1). The State contends that the five-year limitations period of § 26-17-6(a) prohibits an action brought by a presumed father to establish the nonexistence of paternity presumed under § 26-17-5(a)(1). A plain reading of § 26-17-6(a) and (b) refutes this contention. Section 26-17-6(a) and (b) provide:
"(a) A child, a child's natural mother, or a man presumed to be the child's father under subdivision (1), (2), or (3) of Section 26-17-5(a), may bring an action within five years of the birth of the child for the purpose of declaring the existence of the father and child relationship presumed under subdivision (1), (2), or (3) of Section 26-17-5(a); or
"(b) Any interested party may bring an action at any time for the purpose of determining the existence or non-existence of *653 the father and child relationship presumed under subdivision (4) or (5) or (6) of Section 26-17-5(a)."
(Emphasis added.)
Section 26-17-6(a) expressly limits to five years after a child's birth an action to declare the "existence" of the father and child relationship presumed under § 26-17-5(a)(1), (2), or (3). Had the Legislature intended the same five-year limitations period to apply to an action to establish the "non-existence" of the relationship, it would have included the term "non-existence" in § 26-17-6(a), as it did in § 26-17-6(b). The choice to exclude the word "non-existence" in § 26-17-6(a) indicates that the Legislature did not intend to impose a strict five-year limitations period on actions brought to challenge a presumption of paternity. See Commonwealth v. O'Brien, 390 Pa. 551, 136 A.2d 451 (1957) (holding that a statute providing for blood testing in "any proceeding to establish paternity" did not authorize blood tests in a proceeding by the putative father to challenge paternity); see generally House v. Cullman County, 593 So.2d 69, 75 (Ala.1992) (stating that a court should not arbitrarily disregard marked differences in terminology, but should infer that material differences in language in different clauses of a statute were not inadvertent).[2]

III. Separation of Powers
The child's guardian ad litem argues that the legislative command of § 26-17A-1that trial courts reopen final judgmentsimpinges on the judicial power to render final judgments, thereby violating the separation-of-powers principle embodied in §§ 42 and 43 of the Constitution of Alabama of 1901.[3] Sections 42 and 43 mandate that the three principal powers of government shall be exercised by separate departments. Section 42 provides:
"The powers of the government of the State of Alabama shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another."
Section 43 provides:
"In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men."
*654 The separation-of-powers principle embodied in §§ 42 and 43 may be traced to the French political philosopher Montesquieu. In 1748, Montesquieu posited the political maxim that an individual's liberty depends directly upon separation of the legislative, executive, and judicial powers of government. Montesquieu stated:
"All would be lost if the same man or the same body of principal men, either of nobles, or of the people, exercised [the] three [governmental] powers: that of making the laws, that of executing public resolutions, and that of judging the crimes or the disputes of individuals."
Montesquieu, The Spirit of the Laws 157 (Cohler et al. trans., Cambridge Univ. Press 1989).[4] Expounding on the proposed federal Constitution's embodiment of Montesquieu's separation-of-powers principle, James Madison stated:
"If men were angels, no government would be necessary. If angels were to govern men, neither external nor internal controls on government would be necessary. In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself. A dependence on the people is, no doubt, the primary control on the government; but experience has taught mankind the necessity of auxiliary precautions.
"....
"... In a single republic, all the power surrendered by the people is submitted to the administration of a single government; and usurpations are guarded against by a division of the government into distinct and separate departments."

The Federalist No. 51, at 322-23 (James Madison) (Clinton Rossiter ed., 1961) (emphasis added).
The People of the United States, and the People of Alabama, transformed Montesquieu's maxim from political philosophy into fundamental law by ratifying Constitutions that expressly vest the three great powers of government in three separate branches. See U.S. Const. art. I, § 1 (vesting the legislative power in Congress); id. at art. II, § 1, cl. 1 (vesting the executive power in the President); id. at art. III, § 1 (vesting the judicial power in the Supreme Court and inferior federal courts); Ala. Const.1901, § 44 (vesting the legislative power in the Legislature); id. at § 113 (vesting the executive power in the Governor); id. at amend. 328, § 6.01(a) (vesting the judicial power in the Unified Judicial System). The political maxim posited by Montesquieu and embodied in the United States and Alabama Constitutions as a fundamental legal principle mandates that no branch of government be allowed to exercise any power vested in another branch and not vested in it. Since the ratification of the federal and Alabama Constitutions, the application of the separation-of-powers principle in actual cases has constructed the specific boundaries that separate the powers of the three branches of government. See, e.g., Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (holding that President Truman's seizure of the nation's steel *655 mills was an invalid usurpation of the legislative power); Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (holding that Congress's appointment of purely executive officers to the Federal Election Commission was an invalid usurpation of the executive power); United States v. Klein, 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871) (holding that Congress's prescription of rules of decision for Article III courts was an invalid usurpation of the judicial power); Pennsylvania v. Wheeling & Belmont Bridge Co., 59 U.S. (18 How.) 421, 431, 15 L.Ed. 435 (1855) (recognizing that an act of Congress cannot annul a judgment of the Supreme Court that finally determines the rights of private parties).[5]
This Court has held that an attempt by the Legislature to reopen previously rendered final judgments violated the Alabama Constitution's separation-of-powers principle:
"[T]he manifest purpose of the legislature, in the passage of this act, was to effect an opening and setting aside of certain judgments and decrees, and to grant new trials and rehearings, by peremptorily commanding it to be done by the courts and judges, without permitting them to exercise any judgment in the matter; they certainly exercised no judicial power, for they are prohibited from having any mind in the case."
Sanders v. Cabaniss, 43 Ala. 173, 186 (1869) (emphasis added);[6]id. at 184 (citing Wheeling & Belmont Bridge Co., 59 U.S. (18 How.) at 431). Accord Broadway v. State, 257 Ala. 414, 60 So.2d 701 (1952) (holding that a statute requiring courts to grant new criminal trials impermissibly impinged on the judicial power).
Under the federal constitution, the Supreme Court of the United States has held that three types of legislation violate the separation-of-powers principle by encroaching on the judicial power. Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 218-19, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995). First, legislation that prescribes rules of decision for the Judiciary is, under certain circumstances, unconstitutional. Id. at 218, 115 S.Ct. 1447 (citing Klein, 80 U.S. (13 Wall.) 128, 20 L.Ed. 519). Second, legislation that requires the review of judicial decisions by the other branches of government is impermissible. Plaut, 514 U.S. at 218, 115 S.Ct. 1447 (citing Hayburn's Case, 2 U.S. (2 Dall.) 408 (1792)). Third, legislation that would change the law incorporated into a final judgment rendered by the Judiciary violates the separation-of-powers principle. Plaut, 514 U.S. at 218-19, 115 S.Ct. 1447.

A. The Legislature's Retroactive Reopening of Final Judgments
In Plaut, 514 U.S. at 225, 115 S.Ct. 1447, the Supreme Court applied the third component of the separation-of-powers principle to strike down a statute that required courts to reopen judgments that had previously become final. The Supreme Court elaborated on the third component of the separation-of-powers principle as it affected the contours of the judicial power:

*656 "Article III establishes a `judicial department' with the `province and duty ... to say what the law is' in particular cases and controversies. Marbury v. Madison, 1 Cranch 137, 177, 2 L.Ed. 60 (1803).[[7]] The record of history shows that the Framers crafted this charter of the judicial department with an expressed understanding that it gives the Federal Judiciary the power, not merely to rule on cases, but to decide them, subject to review only by superior courts in the Article III hierarchywith an understanding, in short, that `a judgment conclusively resolves the case' because `a judicial Power' is one to render dispositive judgments. Easterbrook, Presidential Review, 40 Case W. Res. L.Rev. 905, 926 (1990). By retroactively commanding the federal courts to reopen final judgements, Congress has violated this fundamental principle."
Plaut, 514 U.S. at 218-19, 115 S.Ct. 1447 (second emphasis added).[8]
The Supreme Court continued:
"It is the obligation of the last court in the [Article III] hierarchy that rules on the case to give effect to Congress's latest enactment, even when that has the effect of overturning the judgment of an inferior court, since each court, at every level, must `decide according to existing laws.' ... Having achieved finality, however, a judicial decision becomes the last word of the judicial department with regard to a particular case or controversy, and Congress may not declare by retroactive legislation that the law applicable to that very case was something other than what the courts said it was."
Plaut, 514 U.S. at 227, 115 S.Ct. 1447 (emphasis in original) (citations omitted). Thus, the core judicial power is the power to declare finally the rights of the parties, in a particular case or controversy, based on the law at the time the judgment becomes final. In the words of the Supreme Court:
"The finality that a court can pronounce is no more than what the law in existence at the time of judgment will permit it to pronounce. If the law then applicable says that the judgment may be reopened for certain reasons, that limitation is built into the judgment itself, and its finality is so conditioned."
Plaut, 514 U.S. at 234, 115 S.Ct. 1447. Therefore, to the extent § 26-17A-1 is applied retroactively to change the reopening provisions incorporated into paternity judgments that became final before that section was enacted, it impinges on the core judicial power.[9]
*657 This conclusion is buttressed by the Plaut Court's rejection of the argument that Congress could amend Rule 60(b), Fed.R.Civ.P., to reopen final judgments retroactively.[10] While the Plaut Court recognized that Congress could amend Rule 60(b), Fed.R.Civ. P.,[11] it stated that to give such an amendment retroactive effect would impermissibly change the law that was incorporated into the final judgment. Plaut, 514 U.S. at 234-37, 115 S.Ct. 1447.[12]
*658 Similarly, the Alabama Legislature cannot retroactively amend Rule 60(b), Ala. R. Civ. App., to change the law of finality that was incorporated into final judgments before the Legislature's amendment. The paternity judgment in this case became final in 1986, approximately eight years before § 26-17A-1 became law. Thus, the trial court and the Court of Civil Appeals erred in applying § 26-17A-1 to change the rules of finality incorporated into M.A.B.'s 1986 final judgment of paternity.[13]

B. The Legislature's Prospective Reopening of Final Judgments
Although retroactive application of § 26-17A-1 to reopen final judgments would violate the separation-of-powers principle by encroaching on the core judicial power, to the extent that § 26-17A-1 is applied only prospectively to judgments that have become final since that section was enacted there is no violation of the separation-of-powers principle. The Supreme Court has stated, "Congress could undoubtedly enact prospective legislation permitting, or indeed requiring, this Court to make equitable exceptions to an otherwise applicable rule of finality, just as district courts do pursuant to Rule 60(b)." Plaut, 514 U.S. at 237, 115 S.Ct. 1447 (emphasis original). Accord Sanders, 43 Ala. at 180 (discussing the separation-of-powers principle and stating, "`[T]o declare what the law is, or has been, is a judicial power; to declare what the law shall be, is legislative.' ") (quoting Thomas M. Cooley, Constitutional Limitations 91-95 (1868)). Similarly, the Alabama Legislature may amend Rule 60(b), Ala. R. Civ. P., but it may not do so in a manner that impinges on the judicial power by retroactively changing the laws that were incorporated into the judgment when it became final.
In Board of Education of Choctaw County v. Kennedy, 256 Ala. 478, 482, 55 So.2d 511, 514 (1951), this Court stated: "`It is the duty of the court to construe a statute so as to make it harmonize with the constitution if this can be done without doing violence to the terms of the statute and the ordinary canons of construction.'" (Quoting Almon v. Morgan County, 245 Ala. 241, 246, 16 So.2d 511, 516 (1944)). This Court has long recognized:
"`It may be laid down as a fundamental rule for the construction of statutes that *659 they will be considered to have prospective operation only, unless a legislative intent to the contrary is expressed or is necessarily to be implied from the language used or the particular circumstances; especially where to construe the act as retrospective in its operation would render it obnoxious to some constitutional provision, though the fact that the retrospective operation would not be unconstitutional, does not require the act to be construed as restrospective [sic].'"
Greenwood v. Trigg, Dobbs & Co., 143 Ala. 617, 619, 39 So. 361, 361 (1905) (emphasis added) (citation omitted). Accord In re Moneys Deposited in and Now Under the Control of the United States District Court for the Western District of Pennsylvania, 243 F.2d 443, 448 (3d Cir.1957) ("[A] prospective construction is the more appropriate where as here it will eliminate a serious question of constitutional validity which would arise if the statute were to be given retroactive effect."); Norman J. Singer, Sutherland Statutory Construction, § 41.04 (5th ed. 1991) ("The principal explanation offered by the courts is that the statute must be construed to sustain its constitutionality and thus prospective operation will be presumed where a retroactive operation would produce invalidity."). Thus, if § 26-17A-1 can reasonably be construed to operate prospectively, a holding of constitutional infirmity can be avoided.
The statutes struck down in Plaut and in Sanders expressly required retroactive operation.[14] In contrast, the act codified at § 26-17A-1 does not expressly require retroactive operation, but instead provides: "This act shall become effective immediately upon its passage and approval by the Governor, or upon its otherwise becoming a law." Ala. Acts 1994, Act No. 94-633, § 4. Accordingly, we construe § 26-17A-1 to eliminate the "reasonable time" limitations period of Rule 60(b)(6) only for those judgments of paternity that become final on or after April 26, 1994, when that section became law.

IV. Rule 60(b)
Although § 26-17A-1 is not available to M.A.B., whose paternity judgment became final in 1986, Rule 60(b)(6), which was incorporated into that judgment, is available to M.A.B. Rule 60(b)(6), unlike § 26-17A-1, requires a previously adjudicated father to make a motion to reopen the judgment "within a reasonable time."[15] Previously, this Court has rigidly interpreted the "reasonable time" limitation of Rule 60(b), holding that a "reasonable time" began to run when a previously adjudicated father had any reason to doubt that he was the biological father. See, *660 e.g., W.J., 622 So.2d at 362 (holding that the reasonable time allowed by Rule 60(b)(6) began to run when the previously adjudicated father had some reason to doubt that he was the biological father).
Upon further consideration, we believe that in a paternity case a trial court should apply equitable principles, including the doctrine of laches, in determining when the "reasonable time" allowed by Rule 60(b)(6) begins to run and when it expires. See, e.g., Merrill v. Merrill, 260 Ala. 408, 411, 71 So.2d 44, 46 (1954) (stating that the doctrine of laches does not depend on any particular period of time, "but is a principle of good conscience dependent upon the facts of each case"). In determining whether a "reasonable time" has expired, the trial court should consider several factors, including the circumstances under which the original paternity judgment was rendered; the circumstances under which, and when, the previously adjudicated father came to doubt that he was the biological father; when he sought to obtain scientific evidence to determine paternity; when he presented the scientific evidence to the trial court or asked the trial court to order scientific testing; and the burdens imposed on the previously adjudicated father and on the child by the continued enforcement of the prior paternity adjudication or by the reopening of the judgment. See generally Rule 1(c), Ala. R. Civ. P. (stating that the Rules of Civil Procedure "shall be construed ... to secure the just ... determination of every action"); W.J., 622 So.2d at 363 (Maddox, J., dissenting); id. at 363-64 (Houston, J., dissenting).[16]
In this case, the trial court premised its holding on a retroactive application of § 26-17A-1 and did not address M.A.B.'s Rule 60(b)(6) motion. On remand, it should consider that motion; in doing so, it should review the facts and circumstances and consider the factors set out above, in determining whether M.A.B. filed his Rule 60(b)(6) motion within a reasonable time.

V. Summary
In sum, we hold that the limitations period of § 26-17-6(a) does not apply to actions to establish the nonexistence of paternity and that § 26-17A-1, interpreted to apply prospectively, does not violate the separation-of-powers principle. A paternity judgment that became final before the effective date of § 26-17A-1April 26, 1994is subject to being reopened only under Rule 60(b)(6), and then only if the motion to reopen it is filed within a "reasonable time." A paternity judgment that became final on or after April 26, 1994, is subject to being reopened under Rule 60(b)(6) or under § 26-17A-1, which contains no "reasonable time" requirement. We further hold that although the trial court did not reach the issue, M.A.B. may be entitled to relief under Rule 60(b)(6). Accordingly, we reverse the judgment of the Court of Civil Appeals with instructions for that court to order further proceedings in the trial court not inconsistent with this opinion.
REVERSED AND REMANDED.
HOOPER, C.J., and HOUSTON and LYONS, JJ., concur.
MADDOX, J., concurs in Part II; dissents from Part III.A; and concurs in the result as to Part III.B.
ALMON and SHORES, JJ., concur in Parts II, III.A, and IV, and dissent from Part III.B.
KENNEDY, J., concurs in Parts II, III.A, and IV, and dissents from Part III.B.
COOK, J., concurs in Parts II, III.B, and IV, and dissents from Part III.A.
*661 MADDOX, Justice (concurring in part; concurring in the result in part; and dissenting in part).
I concur in Part II; I dissent from Part III.A.; and I concur in the result as to Part III.B. Although I agree that one adjudicated to be the father of a child should be permitted to attempt to reopen the paternity adjudication if he has scientific evidence indicating that he is not the father, I cannot agree with the main opinion's discussion of the separation of powers provision of the Alabama Constitution or with the conclusion that the Legislature was without the constitutional power to provide for the reopening of a judgment of paternity that became final before the effective date of § 26-17A-1April 26, 1994.[17] I write specifically to state why I believe the Legislature, as the policy-making branch of government, can adopt measures that address changing societal needs in the area of family law, an area of the law that determines so many rights and responsibilities growing out of the parent-child relationship.
The decision to vest in individual judges the sole discretion to determine the ultimate question of which judgments of paternity can be reopened might have been the better policy choice, but it is not the choice that the Legislature made, and, except where rights and responsibilities have become vested under a prior paternity judgment, I see absolutely no separation of powers problem. On the contrary, I can see tremendous problems that could be created if a man is forced to support and educate a child that the whole world knows is not his.
This case, unfortunately, is merely symptomatic of the myriad problems that have been caused by an increasingly prevalent immorality and the breakdown of the traditional nuclear family. The breakdown of the nuclear family has caused millions of American children to spend at least some part of their lives in an alternative family arrangement, an arrangement that too often is not an adequate substitute for a stable nuclear family. The arguments made in support of the welfare of these displaced children, many of whom are illegitimate, as is the case here,[18] are very persuasive, but the Legislature has determined that a man who can scientifically show that he is not the father of a child should be allowed to do so and thereby cut off any further parental obligations and responsibilities and any rights of inheritance.
Illegitimate births, such as the one that is the subject of this case, have caused problems throughout history. At common law, illegitimate children were considered to be nonpersons, and the law developed a presumption of legitimacy if a man was married to the mother of the child at the time of conception. As the number of illegitimate *662 births increased, however, there was a concomitant rise in the capacity of science to determine who, in fact, was the father of a child.
Because the breakdown of the nuclear family and the rise in the number of illegitimate children occurred at the same time that scientific testing was improving, several policy questions were presented. One of these questions was the appropriateness of continuing to apply the principle of law that tends to legitimate children, if possible. For several years now, this Court, the Court of Civil Appeals, the trial courts, and indeed the other branches of government, both state and federal, have increasingly been called upon to help address the questions that arise when there is a question whether a particular child is the product of a particular marriage.
For some time I have been troubled by the application of the common law presumptions of legitimacy that a majority of this Court has applied in paternity proceedings, and I have dissented in some of those cases,[19] the most recent being Ex parte W.J., 622 So.2d 358 (Ala.1993), in which I stated that the petitioner there should not have been required to support a child that scientific tests conclusively showed was not his child. Justice Houston also dissented in that case, stating:
"The `truth,' as we now know it, is that W.J. is not the biological father of G.J.'s minor child. This has been recognized by all. There are no disputed facts from which the trier of the facts must ascertain truth. In this case, truth is a given; and the truth is that W.J. is not the biological father of G.J.'s minor child. Should we hold that the trial court abused its discretion in determining that truth should not be time-barred and ruling that W.J. was not legally responsible to continue to reimburse the state? I think not."
622 So.2d at 364.
Although I do not know whether the Legislature, in adopting Act No. 94-633, Acts 1994, now codified as § 26-17A-1, was responding to this Court's holding in W.J., I do know that the power of the Legislature is plenary, and I believe this plenary power enables the Legislature to correct what it might perceive to be an injustice of requiring a man to support a child that he did not sire, but that was apparently the product of an adulterous relationship. The legislative branches of both the State and the Federal Government have attempted to address the problems created by the breakdown of the nuclear family, and no one should be allowed to question the rights of government to require fathers to support their children. These exercises of plenary power should not be so circumscribed that the Legislature could not adopt a statute that would allow a man to reopen a paternity judgment under certain circumstances, as the Legislature did in this case. In the remainder of this opinion I will show, after stating some of the history of the presumption of legitimacy, why I think the Legislature had the power to do what it did.
Historically, courts determined paternity based on a presumption that a child born during a marriage, provided that access to the husband at the time of conception was not impossible, was legitimate and the child was a child of the husband, whether that was true or not. This presumption was based on the policy of the law to confer legitimacy upon children whenever possible, and it was applied even in cases where the wife was guilty of infidelity during the possible period of conception. The strict rule of the common law was eventually relaxed and repudiated, or at least greatly modified, and it ultimately gave way to the modern doctrine that the presumption of paternity may be rebutted by competent and relevant evidence showing that the husband could not have been the father of the child. See Arthur v. Arthur, 262 Ala. 126, 77 So.2d 477 (1955). Indeed, those are the facts in this case. Here, M.A.B. has shown by competent and relevant evidence that he could not have been the father of J.B.
*663 In analyzing whether the Legislature had the power to require the reopening of a paternity judgment in certain factual settings, I am guided first by the well-established principles that duly enacted statutes are presumed to be constitutional and that this Court should sustain a statute "unless it is clear beyond reasonable doubt that it is violative of the fundamental law." Alabama State Federation of Labor v. McAdory, 246 Ala. 1, 9, 18 So.2d 810, 815 (1944). After considering § 26-17A-1 and the distinctive subject matter that statute addresses, I am not convinced beyond a reasonable doubt that the Legislature exceeded its authority when it attempted to modify Alabama domestic relations law.
In analyzing the separation of powers issue, the main opinion relies heavily on Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995). However, in Plaut, the rights of parties to the judgment had become vested, and the judgment at issue was not a judgment that determined future rights and responsibilities of a parent and rights of inheritance that had not become vested. The statute in question in Plaut was Congress's response to Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). Before the entry of the judgment in Lampf, there was not a national statute of limitations governing federal securities fraud cases; in general, the statute of limitations for such actions was borrowed from a comparable state statute of limitations. In Lampf, the United States Supreme Court established that the limitations period applicable to private actions alleging violations of § 10(b) of the Securities and Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5 was one year after the discovery of the facts constituting the violation or three years after the violation. Plaut, 514 U.S. at 214, 115 S.Ct. 1447. As a result of this decision, some private actions that would have been timely under the old statute of limitations were time-barred under the new statute of limitations. In response, Congress amended the Securities and Exchange Act of 1934 to provide that any action that was commenced on or before the date of the Lampf decision and that had been held untimely, based on Plaut, but that would have been timely under the old statute of limitations, could be reinstated by the plaintiff. The United States Supreme Court struck down the amendment as a violation of the separation of powers doctrine.
I agree with the Supreme Court's decision in Plaut, given the facts of that case, and I am firmly committed to the doctrine of separation of powers. However, I do not believe Plaut is relevant to the peculiar situation this Court must address in this case. In this case, M.A.B. was erroneously adjudicated to be the father of a child, in all probability because he was married to the child's mother and the common law presumption of legitimacy was applied. M.A.B. was required to make continuing child support payments based on that adjudication, and he could have been held in contempt of court for his failure to do so. The basic question is whether he should continue to have to support that child when it is possible to show conclusively that he is not the child's father. In my opinion, this is primarily a question of public policy, and the Alabama Legislature has provided a procedure for reopening such adjudications.
A majority of this Court concludes that the Legislature was without power to authorize one adjudicated to be the father of a child to reopen the adjudication if it was made before the effective date of the Act. I do not share that view, and I believe the majority errs in its logic. My domestic relations professor in law school often stated, "When you are dealing with domestic relations you have to get down a different set of books." My professor was right. Cases involving family law in general, and paternity adjudications in particular, are equitable in nature and most judgments based on that law are modifiable when circumstances change. Cf. Hartigan v. Hartigan, 272 Ala. 67, 128 So.2d 725 (1961) (stating that a provision in a divorce judgment requiring periodic payments of alimony is not final in the sense that it cannot be changed, and that a court may modify provisions requiring periodic payments of alimony upon proof of a change in conditions). I realize, of course, that in Hartigan this Court exercised its equitable powers to set aside the prior adjudication; however, does that *664 mean that the Legislature is without power to do so? I think the Legislature has that power, except as to rights that have become vested, such as child support payments previously made.
I recognize the importance of a paternity adjudication and the effect such an adjudication has on the future rights of a child as to support and maintenance and as to inheritance. Because paternity adjudications affect so many rights of a parent and child, they affect the public interest, more so now than when the nuclear family was more intact. Because of that fact, the Legislature has within its plenary power the power to make the policy choices it deems necessary and proper to protect those public interests, including the power to reopen a past adjudication of paternity. Cf. Hartigan, 272 Ala. at 67, 128 So.2d at 728 (explaining that divorce actions have a tripartite character, with the public occupying, in effect, the position of a third party).
In short, I believe that the Legislature, in adopting § 26-17A-1, recognized two things: (1) the changing circumstances that exist in today's society regarding the traditional nuclear family and (2) the advent of accurate scientific tests that can show paternity with certainty. In the context of these recognitions, the Legislature obviously balanced the interests of the child against the interest of the person adjudicated to be the father and concluded that a man should not be forced to continue to pay support for a child that he could scientifically prove was not his.
I have always personally believed that there was something wrong with requiring a man, against his will, to support a child that he did not father, especially when the child is the result of his wife's unfaithfulness.[20]
Based on the foregoing, I conclude that the Legislature did not violate the Constitution by adopting § 26-17A-1, but that it merely determined, as a matter of public policy, that one adjudicated to be the father of a child may reopen the paternity case if he can present scientific evidence indicating that he is not the father. Consequently, I believe the trial court properly reopened this paternity adjudication under § 26-17A-1, and I must respectfully disagree with the holding to the contrary.
ALMON, Justice (concurring in part and dissenting in part).
I agree that the principle of separation of powers, as set out in §§ 42 and 43 of the Alabama Constitution of 1901, prevents the retrospective application of § 26-17A-1, Ala. Code 1975, to judgments that became final before its effective date. Therefore, I concur in Part III.A. of the lead opinion. However, I would also hold that the same principle, for slightly different reasons, prevents the prospective application of that Code section to decisions rendered after its effective date. Therefore, I respectfully dissent from Part III.B. of the lead opinion, that portion of the opinion accepting § 26-17A-1 as constitutional in part.
I believe that the prospective application of § 26-17A-1 to reopen paternity adjudications without any time limitation and without any discretion in the circuit court violates the separation of powers doctrine for two reasons. One, the reopening of such determinations at long-delayed times may disturb settled expectations based on the long-accepted adjudication of paternity. We are reviewing these cases in relation to child support issues, but the adjudication of paternity would also affect other questions, such as inheritance. My second basis for concluding that the statute violates the principle of separation of powers is the directive that "the case shall be reopened." § 26-17A-1(a) (emphasis added). To the extent that this purports *665 to require a setting aside of the paternity adjudication based only on the results of DNA or other paternity tests, I think it violates the judicial decision-making function of deciding each case on its own merits. The equity conscience of the court should be involved, for example, in determining whether to disrupt perceived family ties and estate plans.
Nevertheless, I would respect the intent of the legislature in its adoption of that section by announcing a new rule of application of Rule 60(b), Ala. R. Civ. P., in challenges, such as this one, to paternity adjudications. I would hold that a Rule 60(b) challenge to a paternity judgment entered after April 26, 1994, the effective date of § 26-17A-1, should be decided under the standard of review adopted today in Part IV of the lead opinion for Rule 60(b) challenges to paternity judgments entered before that date. Under that standard, the "reasonable time" within which a person must file a Rule 60(b)(6) motion depends upon all the circumstances, with due regard for the legislative attempt to provide for review more broadly than was allowed in cases decided by this Court before the enactment of § 26-17A-1, such as Ex parte W. J., 622 So.2d 358 (Ala.1993), and Ex parte State ex rel. G.M. F., 623 So.2d 722 (Ala.1993). However, I would hold this construction of the "reasonable time" requirement to apply to paternity judgments that became or become final on or after April 26, 1994, as well as to those that became final before that date.
In Ex parte W.J., this Court held that "W. J.'s unreasonable delay bars his relief in this case." 622 So.2d at 363. This holding was based on the fact that at the time of the 1981 paternity action against him W.J. had some "reason to doubt," 622 So.2d at 362, that he was the father of the child, but did not bring his action seeking relief from that adjudication until 1990. The 1990 challenge to the paternity adjudication was based on DNA tests that W.J. obtained on himself and the child in 1989; one could infer that he had the testing done because the court had doubled the amount of child support he was required to pay. Thus, under a generous reading of the "reasonable time" requirement of Rule 60(b)(6), the circuit court reasonably could have found that W.J. first had an evidentiary basis for challenging his alleged paternity in 1989 and that he filed his Rule 60(b) motion within a reasonable time thereafter. I dissented in Ex parte W.J., but I followed the rule of Ex parte W.J. in writing the majority opinion in Ex parte State ex rel. G.M.F., supra.
In light of the legislature's indication that it disapproves of the strict application of the "reasonable time" limitation of Rule 60(b)(6), I would apply a more expansive reading of that limitation to cases such as this one. I would apply the standard discussed in Part IV of the lead opinion to paternity challenges henceforth. Thus, I concur in Part IV of the lead opinion.
I also concur in Part II of the lead opinion.
SHORES, J., concurs.
KENNEDY, Justice (concurring in part and dissenting in part).
I concur in Part II, Part III.A., and Part IV of the main opinion. I dissent as to Part III.B. I agree that § 26-17A-1, Ala.Code 1975, when applied retroactively, violates the doctrine of separation of powers. However, I believe that prospective application of the statute also violates the separation of powers doctrine. Additionally, I believe that § 26-17A-1 violates the equal protection guaranties of the United States Constitution and the Alabama Constitution.
As early as 1869, this Court held that the legislature could not pass an act requiring courts to reopen cases and grant new trials, because to do so would violate the separation of powers doctrine. Sanders v. Cabaniss, 43 Ala. 173 (1869). In Sanders, the post-Civil War legislature passed a bill requiring courts, if petitioned, to reopen judgments that had been rendered after May 25, 1865, if the actions in which the judgments were entered had originated before that date.
"[T]he manifest purpose of the legislature, in the passage of this act, was to effect an opening and setting aside of certain judgments and decrees, and to grant new trials and rehearings, by peremptorily commanding it to be done by the courts and judges, *666 without permitting them to exercise any judgment in the matter; they certainly exercised no judicial power, for they are prohibited from having any mind in the case.
"If there can be any doubts on this subject they are cleared away and removed, by reference to the title of the act, which is `An act to declare void certain judgments, and to grant new trials in certain cases therein mentioned.' To do this is clearly to exercise a judicial, and not a legislative power; a power that legitimately belongs to courts and judges."
43 Ala. at 186.
In 1949, the Alabama legislature enacted a law requiring circuit courts to grant new trials under certain circumstances. Codified at Title 15, § 305, Ala.Code of 1940, that law provided that if the prosecutor in a criminal case "makes any comment concerning the defendant's failure to testify, [then] a new trial must be granted on motion filed within thirty days from entry of the judgment." See Broadway v. State, 257 Ala. 414, 415, 60 So.2d 701 (1952).
In Broadway, this Court recognized that the courts derive their powerincluding the authority of the circuit courts to grant new trialsfrom the constitution:
"It has been the firm understanding of the courts in the interpretation of the Constitution that those courts which derive their existence from the Constitution, succeeding common law courts of historic origin, cannot have their functions and their orderly processes disturbed by any legislative enactment."
257 Ala. at 417-18, 60 So.2d at 704.
The Broadway Court stated that, except insofar as the constitution authorizes it to do so, "`the legislature cannot ... diminish the essentials of the jurisdiction, functions, or judicial powers so conferred on [the courts], nor abrogate or abridge their inherent powers or functions. In other words, the legislature cannot take from courts power which it does not give.'" 257 Ala. at 418, 60 So.2d at 704, quoting 21 C.J.S. Courts, § 122 (emphasis added in Broadway).
"To give the 1949[act] the effect which its language imports is to deprive the circuit court of its constitutional power to function in a judicial way in that respect. It cannot be rightly conceived that there is legislative competency to create a duty on the part of such a court without exercising any discretion or judgment, when a performance of that duty is an exercise of the judicial function, and if it is performed a compliance would result in the duty to perform a ministerial act on the part of the court to grant a motion for a new trial if the defendant is convicted and moves for a new trial. Such, it seems to us, is so plainly an infringement by legislative power upon judicial power that we cannot afford to labor under it. The Constitution which created the circuit court and this Court did not contemplate that it should be required to act ministerially in passing upon the rights and liberties of parties before those courts, when such act calls for a judicial function...."
Broadway, 257 Ala. at 418, 60 So.2d at 704-05.
As Judge Crawley noted in his well-reasoned dissent in K.M. v. G.H., 678 So.2d 1084 (Ala.Civ.App.1995), other state courts have struck down similar attempts by legislatures to reopen final judgments. In Ratcliffe v. Anderson, 72 Va. (31 Gratt.) 105 (1878), the Virginia Supreme Court of Appeals struck down a post-Civil War statute authorizing the reopening of judgments rendered after 1866. In Ratcliffe, a debtor wanted to reopen a case after a final judgment had been rendered, in order to show that he had contracted with his creditor using Confederate currency as the standard of value, and to have his debt reduced from its face amount to its post-War depreciated value. "[T]he legislature interfered to provide a new remedy for the benefit of a class of persons to obtain a rehearing in suits in which judgments and decrees had been made, and became final against them." 72 Va. (31 Gratt.) at 111.
In Lawson v. Jeffries, 47 Miss. 686, 12 Am. Rep. 342 (1873), the Mississippi Supreme Court held that legislation granting new trials in all cases where the judgments were *667 rendered after 1861 violated the separation of powers provisions in the state and federal Constitutions. As the Mississippi Supreme Court aptly noted:
"`If a review of such judgments may be ordered for one cause, it may be equally so for another, or any cause within the discretion of the legislature.'"
47 Miss. at 704, 12 Am. Rep. at 351.
The Mississippi court also correctly stated:
"If a legislative body may grant a new trial, it may order a continuance, annul a judgment, suspend a trial, direct the judgment to be entered, and otherwise interfere with the discretion and independence of the judiciary. The evils that would flow from such an assertion of legislative power are too apparent to be enumerated...."
47 Miss. at 704, 12 Am.Rep. at 353.
Long before the "new trial" cases arose following the Civil War, the New Hampshire legislature had attempted to order a court to grant a new trial to the losing party in a probate proceeding. In Merrill v. Sherburne, 1 N.H. 199, 202, 8 Am.Dec. 52, 55 (1818), the New Hampshire Supreme Court noted that the act "does not empower the court in their discretion to grant or refuse a new trial; but directs that `the cause shall be heard' again; and thus amounts to an absolute reversal of the judgment...." In discussing the separation of powers doctrine, the court stated:
"One prominent reason for creating the judicial distinct from the ... legislative department, was that the former might determine when laws were ... `repugnant [or contrary to the constitution],' and so operate as a check upon the latter, and as a safeguard to the people against its mistakes or encroachments. But the judiciary would in every respect cease to be a check on the legislature, if the legislature could at pleasure revise or alter any of the judgments of the judiciary. The legislature, too, would thus become the court of last resort, `the superior court,' or `supreme judicial' tribunal of the state ...."
1 N.H. at 210, 8 Am.Dec. at 61-62 (emphasis added).
As recently as 1984, the Massachusetts Supreme Judicial Court struck down a statute that would have restored a dismissed case to the active docket of a trial court. The court wrote:
"The Legislature apparently felt that the judgment of dismissal unjustly deprived the plaintiff of his right to seek compensation for the taking of his property. To remedy that perceived injustice, it attempted to nullify the judgment by legislatively restoring the case to its status before the judgment was entered. But `[t]he judgment of a court must stand as final. It can be reversed, modified or superseded only by judicial process. It is wholly under the control of the judicial department of government. The Legislature cannot "supersede" a judgment of a court by its direct declaration to that effect.' Because the effect of [the statute] would be to annul the Superior Court judgment dismissing the case, the statute is an attempt by the Legislature to exercise a power that is exclusive to the judiciary, and thus the statute violates [the separation of powers provision of the Massachusetts constitution.]"
Spinelli v. Commonwealth, 393 Mass. 240, 242, 470 N.E.2d 795, 796 (1984).
In 1995, the United States Supreme Court in Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995), held that by requiring federal courts to reopen final judgments entered pursuant to § 10(b) of the Securities Exchange Act, Congress had violated the fundamental principle of separation of powers. Plaut involved Congress's reaction to the Supreme Court's earlier decision in Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), in which the Court had adopted a uniform national limitations period for civil actions brought under § 10(b). After Lampf was decided, a number of § 10(b) actions were dismissed as untimely; Plaut's case was among them. Plaut did not appeal the dismissal. Some months later, Congress enacted a statute that rejected the holding in Lampf for cases filed before Lampf was decided; that statute effectively required a court to reinstate a *668 § 10(b) action on the motion of the plaintiff if the action would have been considered timely under the law that was applicable before Lampf was decided.
The Supreme Court held that the Article III grants the federal courts "the power, not merely to rule on cases, but to decide them, subject to review only by superior courts in the Article III hierarchy." Plaut, 514 U.S. at 218-19, 115 S.Ct. 1447. The Supreme Court concluded that "[b]y retroactively commanding the federal courts to reopen final judgments, Congress has violated this fundamental principle." 514 U.S. at 219, 115 S.Ct. 1447.
The separation of powers doctrine is "violated when an individual final judgment is legislatively rescinded for even the very best of reasons, such as the legislature's genuine conviction (supported by all the law professors in the land) that the judgment was wrong; and it is violated 40 times over when 40 final judgments are legislatively dissolved." Plaut, 514 U.S. at 228, 115 S.Ct. 1447.
The Supreme Court in Plaut addressed the argument that the statute was similar to Rule 60(b), F.R.Civ.P., which authorizes the trial courts to relieve parties from final judgments for grounds such as excusable neglect, newly discovered evidence, fraud, or any other reason justifying relief. Rule 60(b), F.R.Civ.P. (which is virtually identical to Rule 60(b), Ala.R.Civ.P.), calls for the exercise of the trial court's discretion. The Supreme Court said of that Rule:
"Rule 60(b) ... does not impose any legislative mandate to reopen [a final judgment] but `merely reflects and confirms the courts' own inherent and discretionary power, firmly established in English practice long before the foundation of our Republic,' to set aside a judgment whose enforcement would work inequity. Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 244, 64 S.Ct. 997, 88 L.Ed. 1250 (1944). Thus, Rule 60(b), and the tradition that it embodies, would be relevant refutation of a claim that reopening a final judgment is always a denial of property without due process; but they are irrelevant to the claim that legislative instruction to reopen impinges upon the independent constitutional authority of the courts."
514 U.S. at 233-34, 115 S.Ct. 1447.
The legislature's mandate in § 26-17A-1 that a trial court reopen a final judgment will, whether applied retroactively or applied prospectively, undermine the checks and balances built into our system of government. The Alabama Constitution gives the judicial branch the power to interpret the law. That power necessarily includes the power to render dispositive judgments. It is understandable that the legislature would want to undo the injustice of forcing a man to pay child support when scientific proof excludes his being the biological father of that child. However, the legislature was without the power to do so. The power to undo such a judgment remains with the trial court, under Rule 60(b), Ala.R.Civ.P.
Section 26-17A-1 also violates the equal protection doctrine of the United States Constitution and the Alabama Constitution because it allows only one group of people affected by paternity determinations to reopen a case. Under the statute, neither mothers nor children could undo a paternity adjudication.
Section 26-17A-1 states: "Upon petition of the defendant ..., where the defendant has been declared the legal father, the case shall be reopened if there is scientific evidence presented by the defendant that he is not the father." A court construing a statute must give the words used in the statute "their plain, natural, ordinary, and commonly understood meaning." Ex parte New England Mutual Life Ins. Co., 663 So.2d 952, 955 (Ala.1995).
"The cardinal rule of statutory construction is to ascertain and effectuate the intent of the Legislature. If a statute is not ambiguous or unclear, the courts are not authorized to indulge in conjecture as to the intent of the Legislature or to look to consequences of the interpretation of the law as written."
Ex parte Presse, 554 So.2d 406, 411 (Ala. 1989). Clearly, only a father can reopen a paternity judgment under this statute, given *669 unambiguous language in the statute. If the legislature had intended to allow mothers and children to reopen final adjudications of paternity, it would have so stated in the statute.
The equal protection doctrine requires that all "similarly situated" persons be treated alike. For purposes of this case, other similarly situated persons would include those persons who were parties to a prior paternity adjudication that is now challenged. Does the legislature's clear exclusion of mothers and children affected by paternity judgments from the group allowed to reopen judgments violate the Equal Protection Clause of the Fourteenth Amendment or the equal protection guaranty of Alabama law?
The Fourteenth Amendment to the United States Constitution provides that "No state shall ... deny to any person within its jurisdiction the equal protection of the laws." In considering whether a state statute violates the Equal Protection Clause, we apply different levels of scrutiny to different types of classifications. At the lowest level, a statutory classification must be rationally related to a legitimate government interest. At the highest level, classifications based on race or national origin, or affecting fundamental rights, are given strict scrutiny. Between these lies a level of intermediate scrutiny, which has been applied to discriminatory classifications based on gender or illegitimacy. Clark v. Jeter, 486 U.S. 456, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988).
To withstand intermediate scrutiny, a statutory classification must be substantially related to an important governmental objective. Does the distinction made in § 26-17A-1 bear a substantial relationship to some important state interest?
Section 26-17A-1 authorizes a defendant in a paternity action to reopen an adjudication of paternity if he has scientific proof indicating that he is not the biological father of the child. The purpose of the statute, to remedy the injustice of erroneous paternity adjudications, is an important government interest. However, the classifications established by the legislature are not "substantially related" to that purpose. By allowing only defendant fathers to refute an adjudication of paternity, the goal of remedying erroneous paternity adjudications is achieved for only some of those persons who are similarly situated. Therefore, the classification violates the equal protection guaranties of the United States Constitution and the laws of Alabama.
In Caban v. Mohammed, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979), the United States Supreme Court dealt with a New York Domestic Relations Law provision that made a distinction between unwed fathers and unwed mothers; that provision permitted an unwed mother, but not an unwed father, to block the adoption of their child simply by withholding consent. The Supreme Court held that that distinction was substantially related to the state's interest in providing adoptive homes for its illegitimate children. The distinction "`must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'" Caban, 441 U.S. at 391, 99 S.Ct. 1760, quoting Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920), and Reed v. Reed, 404 U.S. 71, 76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).
This Court has determined that §§ 1, 6, and 22 of the Declaration of Rights of the Alabama Constitution combine to guarantee equal protection under the laws of Alabama. Moore v. Mobile Infirmary Ass'n, 592 So.2d 156 (Ala.1991). I conclude that the statutory classification created by § 26-17A-1 is not substantially related to the object of the legislation, and therefore violates both the United States Constitution and the laws of Alabama.
COOK, Justice (concurring in part and dissenting in part).
I concur with those portions of the lead opinion holding (1) that the statute of limitations does not bar M.A.B.'s petition to reopen the question of his paternity; (2) that Ala. Code 1975, § 26-17A-1, does not, when applied prospectively, violate the principle of separation of powers; and (3) that the "reasonable time" element of Ala. R. Civ. P. *670 60(b)(6) is, in this class of cases, to be construed much more liberally than it has been in the past. I dissent, however, from that portion of the opinion holding that § 26-17A-1 violates the separation-of-powers principle if applied retroactively; therefore, I also dissent from the judgment of reversal.

I. Separation of Powers

A.
Relying primarily on, and quoting, Judge Crawley's dissent in K.M. v. G.H., 678 So.2d 1084, 1097 (Ala.Civ.App.1995), Jenkins, the guardian ad litem for the minor child, contends that "`the legislature may not, without violating the separation of powers doctrine, order a court to reopen a final judgment and grant a new trial.'" Brief in Support of Petition of Guardian ad Litem for Writ of Certiorari, at 13. Cases cited in support of this proposition are: Sanders v. Cabaniss, 43 Ala. 173 (1869); Lawson v. Jeffries, 47 Miss. 686 (1873); Ratcliffe v. Anderson, 72 Va. (31 Gratt.) 105 (1878); and Broadway v. State, 257 Ala. 414, 60 So.2d 701 (1952). Because, he insists, § 26-17A-1 has this effect, it violates the separation-of-powers principle. I find these cases to be inapposite.
Sanders v. Cabaniss involved the effect of Act No. 59, §§ 5-6, 1868 Ala. Acts 415, which, significantly, was entitled: "An act to delare void certain judgments, and to grant new trials in certain cases therein mentioned, and to repeal sections 2876 and 2877, of the [Ala.Code 1867]." (Emphasis added.) Section 5 provided:
"That any judgment or decree rendered since the 25th day of May, 1865, when the original cause of action originated prior to that date, such judgment or decree shall be opened on application, as hereinbefore provided, accompanied with an affidavit that such cause of action did originate prior to the 25th day of May, 1865."
Section 6 provided: "That on all new trials of causes originating under the provisions of this act, the defendant shall be entitled to all the rights he would have had if no suit had been previously commenced." (Emphasis added.)
Pursuant to these provisions of the statute, and upon the motion of William H. Sanders and Virginia H. Markham, a court of chancery, on January 1, 1869, reinstated an action in which a decree had been entered on August 11, 1868. 43 Ala. at 174-75. That decree had established a lien, which was to be satisfied by Sanders and Markham, against "certain lands." Id. at 174. The broad, substantive issue presented to this Court was whether the above-quoted provisions of the statute violated the principle of separation of powers. The Court held that they did.
In so holding, it explained that the "lines of separation" between powers allocated to the judicial and legislative departments respectively "some times approach so near to each other, that, in some cases, it requires great precision to determine where the true line of separation is." Id. at 180. The Court then set forth some general principles applicable in defining the "line of separation." It explained, for example: "`[T]o declare what the law is, or has been, is a judicial power; to declare what the law shall be, is legislative....'" Id. at 180 (emphasis added). "It has been said, that which distinguishes a judicial from a legislative act is," the Court continued, "that the one is a determination what is the existing law in relation to some particular thing already done or happened, while the other is a predetermination of what the law shall be, for the regulation and government of all future cases falling under its provisions." 43 Ala. at 181.
The Court in Sanders also relied in part on Alabama Life Insurance & Trust Co. v. Boykin, 38 Ala. 510 (1863), explaining:
"In [Boykin], the court decide[d] that the first section of the act of February 8th, 1858, ... which provides, that conveyances by husband and wife heretofore made, shall not be held insufficient in law, on account of defects in the certificate of acknowledgment, is unconstitutional. The court [held] that the passage of the act was an attempt to make valid and effective, that which was before inoperative and void; effective, to divest a title out of one, and vest it in another, and this by a mere edict of legislation; an attempt to declare, not only what the law shall be, but what the law has been...."
*671 43 Ala. at 187 (emphasis added). The Court concluded that Act No. 59, § 5, violated the separation-of-powers principle in that it rendered the chancellor "the mere instrument of the legislature to register their will; nothing more." 43 Ala. at 188.
Similarly, in the second case cited by Jenkins, the Virginia Court of Appeals held that the legislature could not constitutionally grant the judiciary power to void and set aside a final judgment for the purpose of depreciating the amount of the judgment to its value in Confederate currency. Ratcliffe v. Anderson, 72 Va. (31 Gratt.) 105 (1878). The court explained:
"When the act under which the claim in this case is asserted was passed, the defendant in error (Anderson) had recovered a judgment against Ratcliffe. That judgment was a final adjudication of the rights of the paries, and had so stood for nearly seven years before the passage of the act. The rights of Anderson and those claiming under him had become fixed and vested; and any attempt on the part of the legislature to impair these vested rights was an invasion of judicial authority, and must be treated as unconstitutional and void.
"... Such an act `professes to grant to one party in a cause which has been, according to existing laws, finally decided, special authority to compel the other party, contrary to the general law of the land, to submit his cause to another court for trial; the consequence of which may be the total (or partial) loss of all those rights, or all that property which the judgment complained of had entitled him, and those claiming under him, to hold and enjoy....'"
72 Va. (31 Gratt.) at 110 (emphasis added).
In the third case cited by Jenkins, the Supreme Court of Mississippi considered the constitutionality of an act passed by the Mississippi legislature purporting to abrogate and annul all judgments entered between January 9, 1861, and April 29, 1868, upon an affidavit by the unsuccessful litigant stating that the affiant had not been represented by counsel in the prior adjudication. Lawson v. Jeffries, 47 Miss. 686 (1873). The court stated:
"`[A] judgment of a court becomes final when, by the then existing laws, the time for a review and for reversal for error has expired; it then becomes a vested right, by force of the constitution and the existing laws; and a statute designed to retroact on such a case, by reviving the right of review, is unconstitutional and void.'"
Id. at 701. The court concluded that the act "was a judicial act [as opposed to legislative], and, therefore, unauthorized." Id. at 707.
Finally, Jenkins cites Broadway v. State, 257 Ala. 414, 60 So.2d 701 (1952), in which this Court held that the legislature could not require the judiciary summarily to grant a criminal defendant a new trial merely upon a showing that the "prosecuting attorney [made some] comment concerning the defendant's failure to testify." Id. at 415, 60 So.2d at 702. It reasoned that a legislative act having that effect would "deprive the circuit court of its constitutional power to function in a judicial way in that respect." Id. at 418, 60 So.2d at 704.

B.
At first glance, the 19th century cases cited by Jenkins appear to support his argument. Closer examination, however, reveals that they resemble this case only superficially. Indeed, more to the point are more recent United States Supreme Court decisions, which I will now discuss, considering their applications to the peculiar facts of this case, and contrasting this case with those cases cited by Jenkins.[21]
United States v. Sioux Nation of Indians, 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980), is particularly analogous to this case. There, the Supreme Court considered whether Congress could, without violating the principle of separation of powers, authorize the *672 United States Court of Claims to reopen and relitigate a claim against the United States barred by the doctrine of res judicata, "to take new evidence in the case, and to conduct its review on the merits de novo." Id. at 389, 100 S.Ct. 2716. It answered that question in the affirmative.
That claim was asserted by the Sioux Nation against the United States, seeking compensation, with interest accruing from 1877,[22] for the "taking" of the Black Hills of South Dakota without just compensation. It was first adjudicated in 1942 and a judgment rendered in favor of the United States. Id. at 384, 100 S.Ct. 2716. See Sioux Tribe of Indians v. United States, 97 Ct.Cl. 613 (1942), cert. denied, 318 U.S. 789, 63 S.Ct. 992, 87 L.Ed. 1155 (1943). At that time, the Court of Claims held that it was not legally authorized "to question whether the compensation afforded the Sioux by Congress in 1877 was an adequate price for the Black Hills." 448 U.S. at 384, 100 S.Ct. 2716.
Subsequently, Congress enacted legislation creating an "Indian Claims Commission" (the "Commission") to inquire into "tribal grievances." Id. See Indian Claims Commission Act, 25 U.S.C. § 70 et seq. The Sioux Nation reasserted its claim with the Commission, which concluded that the United States was liable to pay "just compensation for the taking of the Black Hills." 448 U.S. at 386, 100 S.Ct. 2716. The United States appealed to the Court of Claims, which, in 1975, "held that the merits of the Sioux' taking claim had been reached in 1942, and ... was [in 1975] barred by res judicata." Id. at 388, 100 S.Ct. 2716 (emphasis added). See United States v. Sioux Nation, 207 Ct.Cl. 234, 518 F.2d 1298, cert. denied, 423 U.S. 1016, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975).
Three years later, Congress passed Pub.L. 95-243, 92 Stat. 153, amending 25 U.S.C. § 70s(b); that new law provided for de novo review in the Court of Claims "of the merits" of the taking claim, "without regard to the defenses of res judicata and collateral estoppel." 448 U.S. at 389, 100 S.Ct. 2716. Pursuant to that statute, the Court of Claims reexamined the merits of the Sioux Nation's claims. Id. It held that the "1877 Act [had] effected a taking of the Black Hills," for which the United States was required to pay just compensation, and it awarded the Sioux Nation a sum representing the 1877 fair market value of the Black Hills, plus annual interest "dating from 1877." Id. at 389, 390, 100 S.Ct. 2716.
On the petition of the United States for certiorari review, the Supreme Court considered, among other things, whether Congress violated the separation-of-powers doctrine in providing for the abrogation of the Court of Claims judgments of 1942 and 1975, and the reconsideration of the merits of the Sioux Nation's claims. Id. at 391, 100 S.Ct. 2716. The Court concluded that it had not. Id. at 397, 100 S.Ct. 2716. It explained that "Congress has the power to waive the res judicata effect of a prior judgment entered in the Government's favor on a claim against the United States." Id. Sioux Nation's rationale applies with equal force to the situation presented in this case. This is so because the Alabama Legislature, no less than Congress, possesses the power to enact legislation waiving the res judicata effect of a judgment entered in its favor on a claim against the State. A paternity adjudication in a case where the State has provided assistance through the "Aid to Families with Dependent Children" program ("AFDC"), or in which the action was brought in the name of the State, pursuant to Ala.Code 1975, § 26-17-7,[23] is a judgment in favor of the State, and the readjudication of paternity pursuant *673 to § 26-17A-1 is a claim "against," or adverse to, the State.
These conclusions follow from the role exercised by the State in providing AFDC, pursuant to the Child Support Programs, Ala.Code 1975, §§ 38-10-1 to -53, and in bringing actions pursuant to § 26-17-1, which is the statutory directive providing that paternity actions be brought in the name of the State of Alabama. For example, the Child Support Programs authorize the Department of Human Services ("DHR") to "operate [such] child support programs [as] locating absent parents, establishing paternity, establishing or modifying support orders, enforcing support obligations and related matters." Section 38-10-3(a). "As a condition of eligibility for aid, each recipient of aid to families with dependent children shall be deemed, by accepting aid, to have made an assignment to the department of the right to any support owed up to the amount of aid paid by the department...." Section 38-10-4. DHR is then "subrogated to the right of such child or recipients ... to collect and receive all child support payments and to initiate any support action existing now or in the future under the laws of Alabama." Id. Having disbursed public funds for AFDC, and, consequently, having acquired the right of subrogation, the State becomes the real party in interest in litigation affecting its right of recovery. Ex parte W.J., 622 So.2d 358, 363 (Ala.1993) (Houston, J., dissenting); State ex rel. Robertson v. Robertson, 675 So.2d 422, 424-25 (Ala.Civ.App.1995).
Thus, a paternity adjudication in a case where the State has provided AFDC is a judgment in favor of the State. Conversely, an action pursuant to § 26-17A-1 to set aside a prior adjudication of paternity is a claim "against," or adverse to, the State, because, if the prior adjudication is set aside, the State loses its right to recoup AFDC payments it has made from the party formerly adjudicated liable for child support.
The real effect, therefore, of § 26-17A-1 is to deny the State the benefit of a res judicata defense in those cases in which the State has acquired an interest. This the legislature may do without violating the doctrine of separation of powers. Sioux Nation, supra.
In that respect, § 26-17A-1 differs remarkably from the statutes invalidated in the cases on which Jenkins relies. Very simply, none of the statutes under review in those cases involved claims against the State directly implicating the state treasury. But there are other dispositive distinctions that will become more apparent after a brief discussion of Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995).
The dispute in Plaut involved the power of Congress retroactively to reopenin private, civil actions based on the Securities Exchange Act of 1934, § 10(b), codified as amended, 15 U.S.C. § 78j(b), and Securities Exchange Commission Rule 10b-5final judgments holding that the claims were barred by the limitations period applicable when the judgments became final. The legislative action reviewed in Plaut was Congress's response to Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), in which the Supreme Court decided, for the first time, that the limitations period applicable to private actions alleging violations of § 10(b) and Rule 10b-5 was "one year after the discovery of the facts constituting the violation and ... three years after such violation." 514 U.S. at 213, 115 S.Ct. 1447. The lower federal courts had, until Gilbertson was decided, applied "applicable state limitations period[s]." 514 U.S. at 216, 115 S.Ct. 1447.
In response to Gilbertson, Congress amended the Securities Exchange Act of 1934 by a provision codified at 15 U.S.C. § 78aa-1. The amendment provided that any such action that was "commenced on or before" the Gilbertson decision; that was adjudicated on the basis of the new rule to be "time barred," but would have been "timely" under the former rule; could "be reinstated on motion by the plaintiff." See 514 U.S. at 214-15, 115 S.Ct. 1447. The Court held that § 78aa-1, "to the extent ... it require[d] federal courts to reopen final judgments in private civil actions under § 10(b)," violated the principle of separation of powers. 514 U.S. at 213, 115 S.Ct. 1447.
*674 In the Court's view, the validity of § 78aa-1 turned on whether it operated prospectively or retroactively. According to the Court, "Congress could undoubtedly enact prospective legislation permitting, or indeed requiring, [a court] to make equitable exceptions to an otherwise applicable rule of finality, just as district courts do pursuant to Rule 60(b)," 514 U.S. at 237, 115 S.Ct. 1447 (emphasis in original). More specifically, if the law applicable to the case at the time the judgment is entered "says that the judgment may be reopened for certain reasons, that limitation is built into the judgment itself, and its finality is so conditioned." 514 U.S. at 234, 115 S.Ct. 1447.
What Congress could not do, the Court explained, was "`reverse a determination once made, in a particular case.'" 514 U.S. at 225, 115 S.Ct. 1447. "When retroactive legislation requires its own application in a case already finally adjudicated," the Court continued, "it does no more and no less than `reverse a determination once made, in a particular case.'" Id. at 225, 115 S.Ct. 1447 (emphasis added). "Congress may not declare by retroactive legislation that the law applicable to that very case was something other than what the courts said it was." 514 U.S. at 227, 115 S.Ct. 1447 (emphasis in original). The Court concluded that § 78aa-1 was legislation of the latter type, and, therefore, unconstitutional. 514 U.S. at 227-28, 115 S.Ct. 1447.
The Court's discussion of § 78aa-1 illustrates a fundamental distinction between that statute and § 26-17A-1, the statute involved in this case. In fact, the legislation involved in Sanders v. Cabaniss, 43 Ala. 173 (1869); Lawson v. Jeffries, 47 Miss. 686 (1873); and Ratcliffe v. Anderson, 72 Va. (31 Gratt.) 105 (1878), differed in no substantive respect from that in Plaut. The legislation, which, in all four cases, was fully retroactive, aimed to allow the losing party to retry the case with the possibility of getting a judgment in his favor. In other words, every case involved the destruction of rights that had become fully vested by the prior adjudication.
In Sanders, for example, the statute provided that "on all new trials of causes originating under the provisions of [the] act, the defendant [should] be entitled to all the rights he would have had if no suit had been previously commenced." Act No. 59, § 6, 1868 Ala. Acts 415 (emphasis added). In this way, Act No. 59 divested Cabaniss of the right to enforce the lien to which he was entitled pursuant to the prior adjudication. Thus, Act No. 59 not only destroyed rights that had vested in plaintiffs, but subjected plaintiffs to the possibility of liability to the defendants in subsequent actions. See also Alabama Life Insurance & Trust Co. v. Boykin, 38 Ala. 510, 513 (1863) (separation-of-powers doctrine prohibits legislation that, in voiding a judgment, "divest[s] a title out of one, and vest[s] it in another").
This feature of Act No. 59 was characteristic of the legislation involved in the other three cases. See Plaut (under § 78aa-1a, a Rule 10b-5 action defendant, whose nonliability had been adjudicated, faced anew the prospect of liability to the plaintiff); Lawson, 47 Miss. at 701 (a judgment "becomes a vested right, by force of the constitution and the existing laws; and a statute designed to retroact on such a case ... is unconstitutional and void"); Ratcliffe, 72 Va. (31 Gratt.) at 110 ("[t]he rights of Anderson and those claiming under him had become fixed and vested; and any attempt on the part of the legislature to impair these vested rights was an invasion of judicial authority, and must be treated as unconstitutional and void").
By contrast, § 26-17A-1 disturbs no vested right. This is so, partly because of the peculiar nature of the subject matter it concerns, and partly because of § 26-17A-2, which narrowly restricts the statute's operation and effect. As to the scope of its operation and effect, § 26-17A-2 provides: "In any decree setting aside an order of paternity pursuant to this chapter, there shall be no... reimbursement or recoupment of money or damages against the mother, the State, or any employee or agent of the State." (Emphasis added.) Thus, § 26-17A-2 expressly prohibits a paternity defendant from recovery of any sort, including past payments of child support. In doing so, it focuses exclusively on the duty to pay child support, rendering the operation and effect of § 26-17A-1 prospective only. In other words, the only *675 relief afforded a party seeking to set aside a prior paternity adjudication is purely prospective prospective from the date of the second judgment. In this way, § 26-17A-1 differs fundamentally from the retrospective statutes invalidated in Plaut, Sanders, Lawson, and Ratcliffe.
Similarly, the peculiar nature of the subject matter upon which the statute operates brings it squarely within the class of legislation Plaut excepted from the constitutional prohibition. To reiterate, Plaut stated that "Congress could undoubtedly enact prospective legislation permitting, or indeed requiring, [a court] to make equitable exceptions," 514 U.S. at 237, 115 S.Ct. 1447 (emphasis in original), and that if the law applicable to the case at the time the judgment is entered "says that the judgment may be reopened for certain reasons, that limitation is built into the judgment itself, and its finality is so conditioned." 514 U.S. at 234, 115 S.Ct. 1447.
These principles have particular application to § 26-17A-1, because judgments ordering the payment of child support are always modifiable upon a showing of changed circumstances. Ala. R. Jud. Admin. 32(A)(3); Hall v. Hall, 280 Ala. 275, 192 So.2d 727 (1966); Whitt v. Whitt, 276 Ala. 685, 166 So.2d 413 (1964); Jones v. Jones, 682 So.2d 1387 (Ala.Civ.App.1996); Williams v. Williams, 601 So.2d 1023 (Ala.Civ.App. 1992); Lee v. Lee, 518 So.2d 137 (Ala.Civ. App.1987). Child support payments become "final judgments" only upon accrual. Ex parte State ex rel. Lamon, 702 So.2d 449, 450 (Ala.1997). Corollarily, "judgments as to child support are never res judicata." Tucker v. Tucker, 681 So.2d 592, 594 (Ala.Civ.App. 1996); Thistlethwaite v. Thistlethwaite, 590 So.2d 317 (Ala.Civ.App.1991). Thus, no party has a vested right to unaccrued child support payments. Based on these principles, I conclude that § 26-17A-1, which affects only such payments as were unaccrued as of the time the statute was enacted, disturbs no vested right.
Also significant is the fact that each support payment becomes a "final judgment" upon accrual. Ex parte State ex rel. Lamon, supra. Section 26-17A-1 attached, therefore, to the first such "judgment" that accrued after passage of the statute, and to every such "judgment" as it accrued thereafter. In other words, § 26-17A-1 became the law applicable to the case, governing the defendant's duty to pay child support on the basis of every payment that accrued after passage of the statute. In that way, § 26-17A-1, which "says that the judgment may be reopened for certain reasons," was "built into the judgment itself, and its finality [became] so conditioned." 514 U.S. at 234, 115 S.Ct. 1447. This, the legislature may do.
Broadway v. State, 257 Ala. 414, 60 So.2d 701 (1952), the fourth case cited by Jenkins, differs from the other three in that Broadway did not involve retroactivity. However, Broadway is distinguishable from this case in other respects. In Broadway, a criminal defendant was granted a new trial based on a single comment made by the solicitor during the trial, namely: "`[Defendant's counsel] criticizes our witness in this case, but [defendant's counsel] has not given us any witness to criticize.'" Id. at 415, 60 So.2d at 702. The defendant did not object or, in any way, direct the trial court's attention to the remark until it was made the basis of a motion for a new trial, pursuant to Act No. 124, 1949 Ala. Acts 150, which, as I have stated previously in this opinion, provided: "If the solicitor or other prosecuting attorney makes any comment concerning the defendant's failure to testify, a new trial must be granted...." The statute applied to every "criminal proceeding[]" conducted in Alabama. Id.
This Court stated that a legislative act having that effect would "deprive the circuit court of its constitutional power to function in a judicial way in that respect." 257 Ala. at 418, 60 So.2d at 704. Of the statute, the Court observed:
"This was supposed to make it mandatory upon the circuit court to grant the motion for a new trial when any such comment is made during the progress of the trial, although no objection was made to such comment, and it may not appear that the comment was made in the presence of the jury, and although it may not appear that the comment was of such character as to be prejudicial to the defendant, and may *676 have been of such character as that it could have been easily eradicated from the mind of the jury by prompt instructions from the court, and although it is possible that such would have been done if objection had been made."
257 Ala. at 415-16, 60 So.2d at 702 (emphasis added).
Obviously, because of its very breadth and its application in every "criminal proceeding," this statute would have played havoc with the judiciary. Orderly judicial process in all criminal proceedings would have become an anachronism. It is easily seen that the statute represented an extreme example of such legislative intrusion as is prohibited by the separation of powers.
Section 26-17A-1 is, by contrast, singularly un intrusive. It is narrowly drafted and applies in a very narrow class of cases. Moreover, when it does apply in a particular case, it does nothing to interfere with the orderly judicial process in the case. Unlike the statute in Broadway, § 26-17A-1 does nothing to impugn the effect or operation of statements or evidence presented in the prior adjudication. In other words, it leaves the trial court free to function judicially in the prior, as well as in the subsequent, paternity adjudication. For these reasons, § 26-17A-1 does not violate the principle of separation of powers.

II. Public Policy
Finally, Jenkins contends that § 26-17A-1 violates public policy. Specifically, he states: "Our state's public policy has heretofore prohibited parents from abandoning their parental responsibilities once voluntarily assumed." Brief in Support of Petition for Writ of Certiorari, at 17. "Section 26-17A-1 is against the policy of the state," he adds, "if no timeliness requirement is [read into] to the statute." Id. at 19 (emphasis added).
These contentions essentially mirror the public-policy challenges to § 26-17A-1 that were addressed and rejected by the Court of Civil Appeals in K.M. v. G.H., 678 So.2d 1084 (Ala.Civ.App.1995). That court in K.M. reversed a judgment of the trial court that had held that § 26-17A-1 "violates the public policy favoring the legitimacy of children and the right to rely on finality of judgments." 678 So.2d at 1086. Because the Court of Civil Appeals' discussion of the public policy argument is particularly succinct and applicable to this case, I include substantial portions of that discussion:
"K.M. contends that the trial court erred in finding that the Act violates the public policy of the State of Alabama. The State argues that the Act violates the strong public policy which favors the legitimation of children and the public policy in favor of the finality of judgments.
"....
"`When the legislature of a state has acted on a subject within constitutional authority, public policy is what the statute enacted says or indicates. Thus a constitutional statute cannot be contrary to public policyit is public policy.' Higgins v. Nationwide Mutual Insurance Co., 50 Ala. App. 691, 694, 282 So.2d 295, 298 (1973).
"We find a part of K.M.'s brief on appeal, as it relates to the public policy established by this Act, worthy of quoting:
"`In that regard, it is important to understand that these extraordinary remedies manifest a more important public policy than any of the ones cited by the Trial Court. That public policy involves ensuring public confidence in the edicts of our courts. It is quite obvious that where blatant injustices are allowed to stand, there is an erosion in public support [and] confidence in our court system. Accordingly, where, as in the instant case, the [defendant] can be conclusively established as a matter of fact not to be the father of a child and to be required to `in law' be the father of a child, it lessens the respect on which the decisions of the court are given. Thus, these extraordinary remedies which have been carved out by the legislature and the courts to attack judgments which are clearly inconsistent with the "finality of judgments," are designed to provide mechanisms by which justice is assured. Their availability to correct obvious injustices within our Courts [is] an essential cornerstone of Anglo-American jurisprudence. It is axiomatic, *677 that where there is no remedy, there is no right. In this regard, the Alabama Legislature was acting in accord with the most basic principles in our society in providing a remedy to correct an obvious injustice and vindicate a right. That remedy is narrowly circumscribed and of limited availability.'
"The trial court erred in holding that the Act violates the public policy of the State."
678 So.2d at 1087 (emphasis added).
As the Court of Civil Appeals correctly observes, it is quintessentially the prerogative of the legislature to declare and define public policy. Rogers v. City of Mobile, 277 Ala. 261, 281, 169 So.2d 282, 302 (1964) ("Except as inhibited by specific constitutional provisions, the Legislature has the power to determine and declare the public policy of the state ...."); see Giuliani v. Guiler, 951 S.W.2d 318, 321 (Ky.1997) ("It is beyond challenge that public policy is determined by the constitution and the legislature through the enactment of statutes."); Michaels v. Nemethvargo, 82 Md.App. 294, 309, 571 A.2d 850, 857 (1990) ("the judiciary has generally declared that it is the province of the Legislature to determine the public policy of the State"). To the extent, therefore, that the statute is constitutionaland I would hold that it isthe legislature has the right to declare the public policy of the State on this question.
These disclaimers notwithstanding, I point out that the policy implemented by § 26-17A-1 has much to commend it in relation to the rules the judiciary had formulated based on its conception of former policy. In at least one class of cases, the former policy, as it was understood and applied by the courts of Alabama, worked results that were manifestly inconsistent and fundamentally unfair. That was so when the policy combined with "`[p]ater est quem nuptiae demonstratthe presumption that the husband of the mother of a child born during marriage is the father of that child.'"[24]Ex parte Presse, 554 So.2d 406, 413 (Ala.1989). The presumption "`is often said to be one of the strongest presumptions known to the law.'" Id. In Alabama, it was not "conclusive," but could be rebutted "by proof of impotency on the husband's part, or by want of access to his wife during the time when pregnancy might have occurred, and other conditions in which it was impossible that the husband could have been the father of the child of his wife [born] during the marriage." Adams v. State, 428 So.2d 117, 120 (Ala.Civ.App.1983). See Jackson v. Jackson, 259 Ala. 267, 66 So.2d 745 (1953). The anomalies resulting from the combination of pater est quem nuptiae demonstrat with former, public-policy notions are illustrated by the following hypothetical.
Assume that Mr. and Mrs. A were married on January 1, 1980. Baby A1 was born on January 1, 1981, Baby A2 on January 1, 1983, and Baby A3 on January 1, 1985. Mr. and Mrs. A obtained a final judgment of divorce on January 1, 1987. Mr. A was ordered to make periodic payments for the support of the children.
The marital presumption applies to all three children. But, assume that, in fact, Babies A1 And A3 are not the children of Mr. A. Assume not only that this fact was unknown to Mr. A, but, also, that he had no information at the time of the divorce that would have put him on notice of that fact. Assume further that in 1997, Mr. A discovered, for the first time, facts that caused him to question Mrs. A's fidelity and that he promptly petitioned the court, pursuant to Rule 60(b), to reopen and reexamine the question of the paternity of the children.
If Mr. A argues to the trial court that he, like all the world, did, and should have been able to, rely on the marital presumption, namely, that he was the father of the children born to Mrs. A during the marriage, his argument will be rejected summarily. That is so, because cases decided before the adoption of § 26-17A-1 that would have barred his petition as untimely are legion. He will learn that he should have challenged paternity at the time of the divorce. Mr. A will *678 learn, in other words, that all the world was entitled to rely on this presumption, except the husband of the wife, whose children were born during the marriage.
In practice, therefore, a husbandunlike all otherswas deemed to have relied on the marital presumption at his peril. In order to avoid the untimeliness bar of Rule 60(b), he was required to challenge his wife's fidelity at the earliest opportunity, thus adding to the trauma of a disunited family. Rule 60(b), as applied by our courts to such cases, in effect, penalized husbands who were not always latently, at least, suspicious of their wives. These are "public policies" of which, by the passage of § 26-17A-1, we are well rid.
Furthermore, under the peculiar circumstances out of which paternity adjudications arise, it is fundamentally unfair to ignore on the basis of res judicataevidence that incontrovertibly eliminates the defendant as the biological father, where the other party to that intimate relationship has, in the initial proceeding, either misrepresented the truth to the court and to the defendant, or, as the plaintiff did in this case, suppressed crucial information about paternity. But "fundamental fairness" is the "touchstone," or essence, of due process. Walters v. National Ass'n of Radiation Survivors, 473 U.S. 305, 364 n. 11, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985) (superseded on other grounds by 102 Stat. 4105, 4113-22); Gagnon v. Scarpelli, 411 U.S. 778, 790, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973) (modified in part on other grounds by statute). "Court proceedings are held for the solemn purpose of endeavoring to ascertain the truth which is the sine qua non of a fair trial." Estes v. Texas, 381 U.S. 532, 540, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). "It is precisely the function of a judicial proceeding to determine where the truth lies." Imbler v. Pachtman, 424 U.S. 409, 439, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (White, J., concurring in the judgment).
Thus, § 26-17A-1 was enacted to address the injustice that results when a man is required to support a child where scientific evidence excludes him as the father, and it arose naturally out of the reluctance of the judiciary in cases such as this one to remedy that injustice. Also, it illustrates a legal system that is struggling to adjust to the new and ever-changing realities thrust upon it by rapidly accelerating advancements in society's genetic identification capacity.
Finally, this opinion should not be construed as callous toward the interests of children. To be sure, there is a facile advantage to children to be supported by some man, even one who is not the biological father. But this advantage is only a short-term advantage. Children also have strong interests in knowing who, in fact, their fathers are, or, conversely, in knowing who their fathers are not.
While debate continues over the relative influences of heredity and environment, one thing is clearthe mystic bonds of blood are strong. The strength of these bonds is illustrated in various ways and is observable in ordinary experience. A familiar example is that of adopted children who are nurtured to maturity by exemplary adoptive parents, but, nevertheless, ultimately feel compelled to seek out their biological parents.
A strong sense of personal identity is an asset, and personal identity derives in large measure from knowledge of, and association with, individuals of biological kinship. Thus, blood bonds can, and do, provide long-term stability and support. Section 26-17A-1 does nothing to impair that long-term goal, and, in fact, facilitates it.
In summary, § 26-17A-1 does not violate the principle of separation of powers, even when applied "retroactively." It simply focuses on the duty to pay child support and prohibits a paternity defendant from a recovery of any sort, including past payments of child support. The legal and practical effect of § 26-17A-1 is purely prospective. Therefore, I concur in part and dissent in part.
NOTES
[1] By addressing "paternity," instead of "child support," the Legislature evidenced an intent to expand the scope of Rule 60(b)(6)'s exception to res judicata with respect to paternity judgments. Compare Ex parte W.J., 622 So.2d 358 (Ala.1993) (holding that a prior judgment determining "paternity" was subject to res judicata), with Tucker v. Tucker, 681 So.2d 592, 594 (Ala.Civ.App.1996) (stating that "judgments as to child support are never res judicata").

Moreover, § 26-17A-2, which limits the relief available upon the setting aside of a paternity judgment, provides:
"In any decree setting aside an order of paternity pursuant to this chapter, there shall be no claim for damages against the court rendering the initial order of paternity nor any reimbursement or recoupment of money or damages against the mother, the State, or any employee or agent of the State."
(Emphasis added.) Thus, in addition to using the word "paternity," instead of the term "child support," the Legislature precluded the "recoupment of ... damages against the mother." The word "damages," as used in § 26-17A-2, prevents not only the recovery of previously paid child support, but also the recovery of damages for the false accusation of paternity, or for defamation. See K.M. v. G.H., 678 So.2d 1084, 1088 (Ala.Civ.App.1995) (stating that § 26-17A-2 prevents the recovery of damages against the mother for the false accusation of paternity), cert. quashed, 678 So.2d 1084 (Ala.Civ.App.), cert. denied, ___ U.S. ___, 117 S.Ct. 511, 136 L.Ed.2d 401 (1996); see generally Anderton v. Gentry, 577 So.2d 1261, 1263-64 (Ala.1991) (explaining the elements of defamation and slander related to accusations concerning sexual conduct). It therefore appears that the Legislature intended § 26-17A-1 to provide a broader avenue for relief from the numerous consequences of erroneous paternity determinations than was provided by Rule 60(b)(6) as interpreted in W.J., 622 So.2d at 360.
[2] We note that § 26-17A-1 provides for the reopening of a final judgment of paternity "[u]pon petition of the defendant in a paternity proceeding where the defendant has been declared the legal father." (Emphasis added.) The phrase "paternity proceeding" is a broad phrase, and its plain meaning encompasses any legal proceeding at which paternity is determined. See generally State ex rel. Johnson v. Independent School Dist. No. 810, 260 Minn. 237, 245, 109 N.W.2d 596, 602 (1961) (defining "proceeding" to include "actions and special proceedings before judicial tribunals as well as proceedings pending before quasi-judicial officers and boards"). In Alabama, an action to determine paternity "may be joined with an action for divorce, annulment, separate maintenance or support." Ala.Code 1975, § 26-17-9(a). We conclude that § 26-17A-1 applies to allow a court to reopen any judgment of paternity, whether entered pursuant to a paternity action, a divorce action, or some other action. Cf. Latourell v. Dempsey, 518 N.W.2d 564, 566 (Minn.1994) (construing "proceedings under [the Minnesota Parentage Act]" to include child custody and visitation proceedings). Our conclusion makes unnecessary any discussion of the guardian ad litem's argument that § 26-17A-1 discriminates against certain children based on the type of proceeding at which paternity was adjudicated.
[3] We note that although the parties raised no issue regarding the Contracts Clause, this Court has previously stated that "[a] judgment is a contract." Weaver v. Lapsley, 43 Ala. 224, 233 (1869). In Weaver, at 230-31, 233, this Court held that a statute declaring certain final judgments void and granting new trials violated both the separation-of-powers principle and the Contracts Clause of the Constitution of Alabama of 1865. See generally Ala. Const.1901, § 22 ("[N]o ex post facto law, nor any law, impairing the obligations of contracts ... shall be passed by the legislature...."); § 95 ("There can be no law of this state impairing the obligation of contracts by destroying or impairing the remedy for their enforcement....").
[4] Montesquieu further posited:

"The political liberty of the subject is a tranquillity of mind arising from the opinion each person has of his safety. In order to have this liberty, it is requisite the government be so constituted as one man need not be afraid of another.
"When the legislative and executive powers are united in the same person, or in the same body of magistrates, there can be no liberty; because apprehension may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner.
"Again, there is no liberty, if the judiciary power be not separated from the legislative and executive. Were it joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control; for the judge would be then the legislator. Were it joined to the executive power, the judge might behave with violence and oppression."
I Montesquieu, The Spirit of the Laws 151-52 (Thomas Nugent trans., 1900). Montesquieu's theory reflected the practical lessons of history concerning the concentration of governmental power. 1 Joseph Story, Commentaries on the Constitution of the United States § 524 (5th ed. 1891) ("The general reasoning by which the [separation-of-powers] maxim, is supported ... seems entirely satisfactory[, but w]hat is of far more value than any mere reasoning, experience has demonstrated it to be founded in a just view of the nature of government, and the safety and liberty of the people.").
[5] Thus, the Framers' intent to incorporate Montesquieu's separation-of-powers maxim into the architecture of the Constitution became a practical reality:

"By the time of President Jackson, the structure of separated powers was so well institutionalized that, as Professor Forrest McDonald has written, `... The order was firmly established and self-maintaining: constitutional government had become part of the second nature of homo politicus Americanus.' Thus the intent of the Framers has survived not merely as a theory of how this government should work but as an explanation of how it does in fact work."
John S. Baker, Jr., Constitutional Architecture, 16 Harv. J.L. & Pub. Pol'y 59, 65-66 (1993) (quoting Forrest McDonald, Novus Ordo Seclorum: The Intellectual Origins of the Constitution 292 (1985)).
[6] Sanders dealt with the predecessor to § 42 of the Constitution of Alabama of 1901Article III of the Constitution of Alabama of 1865which provided:

"§ 1. The powers of the government of the state of Alabama shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy to wit: Those which are legislative to one; those which are executive to another; and those which are judicial to another.
"§ 2. No person, or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted."
[7] Chief Justice Marshall, the author of Marbury v. Madison, had strong convictions about the separation-of-powers principle. See Jean Edward Smith, John Marshall: Definer of a Nation 78 (1996) ("From Montesquieu, whose seminal work, The Spirit of the Laws, was translated into English in 1750, Marshall derived a crisp understanding of the doctrine of the separation of powers.").
[8] The principle of separation of powers is especially pertinent with respect to the reopening of judicial decrees. Alexander Hamilton noted:

"A legislature, without exceeding its province, cannot reverse a determination once made in a particular case; though it may prescribe a new rule for future cases."
The Federalist No. 81, at 484 (Alexander Hamilton) (Clinton Rossiter ed., 1961).
[9] Justice Maddox and Justice Cook suggest that the separation-of-powers principle should operate only to prevent a statute from depriving a person of a "vested right." 723 So.2d at 663 (Maddox, J., concurring in part, concurring in the result in part, and dissenting in part); 723 So.2d at 669 (Cook, J., concurring in part and dissenting in part). Justice Maddox and Justice Cook state that Plaut can be distinguished from this case because Plaut dealt with an extension of the statutory limitations period that affected vested rights of the parties.

Although mentioned in dicta in cases interpreting various constitutional provisions, the concept of "vested rights" primarily concerns due process and common-law protections of individual interests from governmental action, not the specific source of the governmental action. See, e.g., Bingham v. City of Tuscaloosa, 383 So.2d 542, 544 (Ala.1980) (stating that "on general due process grounds, ... any regulatory scheme enacted by the City that fails to recognize vested rights of prior interest holders" is invalid) (emphasis added); Barrington v. Barrington, 200 Ala. 315, 76 So. 81 (1917) (holding that although a statute did not violate the Constitution by impairing a contract or imposing an ex post facto punishment, it would not be applied retroactively because it affected a vested right). In contrast, the separation-of-powers principle primarily concerns the manner in which the government exercises power, not the status of a specific right harmed by the exercise of that power. See, e.g., Plaut, 514 U.S. at 239, 115 S.Ct. 1447 ("[T]he doctrine of separation-of-powers is a structural safeguard rather than a remedy to be applied only when specific harm, or risk of specific harm, can be identified.") (emphasis in original); Broadway v. State, 257 Ala. 414, 60 So.2d 701 (1952) (holding, without finding any vested right, that the Legislature could not usurp the power to reopen judgments made final by the Judiciary); see generally Weaver v. Graham, 450 U.S. 24, 29-31 nn. 10 & 13, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981) (stating that the Ex Post Facto Clause, which operates on statutes regardless of their effect on "vested rights," supports the separation-of-powers principle by confining the Legislature to the enactment of prospective criminal sanctions, and the Judiciary to the application of existing criminal law).
This distinction was clearly illustrated in Plaut, where the Supreme Court recognized that Congress's retroactive extension of a limitations period does not violate the Due Process Clause by depriving defendants of a vested right. Plaut, 514 U.S. at 227-29, 115 S.Ct. 1447 (stating that Congress may retroactively extend a limitations period without violating the Due Process Clause) (citing Chase Securities Corp. v. Donaldson, 325 U.S. 304, 311 n. 8, 316, 65 S.Ct. 1137, 89 L.Ed. 1628 (1945) (noting that the retroactive extension of a statutory limitations period did not deprive defendants of a "vested right")). Nonetheless, the Supreme Court held that Congress violated the separation-of-powers principle by commanding the Judiciary to reopen final judgments to accommodate the extended limitations period. Plaut, 514 U.S. at 219, 115 S.Ct. 1447 (stating that Congress's command to reopen final judgments to accommodate the retroactive extension of the statutory limitations period violated the separation-of-powers principle).
[10] The federal version of Rule 60(b) is substantially similar to the Alabama version of Rule 60(b). The major differences are: (1) that while Alabama's rule provides 120 days to file motions to reopen judgments on the basis of mistake, newly discovered evidence, or fraud, the federal rule provides 1 year; and (2) that while Alabama's rule provides for an independent proceeding to set aside certain judgments within 3 years, the federal rule provides for no such proceeding.
[11] Both Congress and the Alabama Legislature may modify or replace rules of procedure, within constitutional limits. Under the Rules Enabling Act, 28 U.S.C. §§ 2072 and 2074, the Supreme Court promulgates rules of civil procedure and submits them to Congress for approval. In Sibbach v. Wilson & Co., 312 U.S. 1, 9-10, 61 S.Ct. 422, 85 L.Ed. 479 (1941), the Supreme Court stated: "Congress has undoubted power to regulate the practice and procedure of federal courts, and may exercise that power by delegating to this or other federal courts authority to make rules not inconsistent with the statutes or constitution of the United States...." Similarly, § 6.11 of Amendment 328 of the Constitution of Alabama of 1901 authorizes the Legislature to change rules of practice and procedure for Alabama courts "by a general act of statewide application."

Although § 6.11 permits the Alabama Legislature to change rules of procedure by statutes of statewide application, this rulemaking power, like that of Congress, is not plenary. Thus, the Legislature could not, by a statute purporting to replace a rule of appellate procedure, strip the Judiciary of the power to make judgments final, and vest that power, for example, in the Alabama Senate. See Ala. Const. §§ 42, 43; amend. 328, § 6.01, 6.02; see generally Kline v. Burke Constr. Co., 260 U.S. 226, 234, 43 S.Ct. 79, 67 L.Ed. 226 (1922) (noting that Congress may not restrict the constitutional jurisdiction of the Supreme Court); Martin v. Hunter's Lessee, 14 U.S. (1 Wheat.) 304, 328-31, 4 L.Ed. 97 (1816) (stating that the full judicial power must be vested in some court). Nor could the Legislature, by a statute purporting to replace a rule of civil procedure, divest itself of the power to tax and spend and vest that power in the Judiciary. See Ala. Const. §§ 42, 43, 72; amend. 328, § 6.01; Opinion of the Justices No. 211, 291 Ala. 262, 265, 280 So.2d 97, 100 (1973) ("The levying of a tax is a purely legislative power...."); Opinion of the Justices No. 64, 244 Ala. 386, 389, 13 So.2d 674, 677 (1943) (stating that under § 72 of the Constitution of Alabama of 1901 "no money shall be paid out of the State treasury except by an appropriation by the Legislature").
[12] Justice Cook states that the holding of the Supreme Court in United States v. Sioux Nation of Indians, 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980), establishes that § 26-17A-1 does not violate the separation-of-powers principle. 723 So.2d at 671-72 (Cook, J., concurring in part and dissenting in part). In Sioux Nation, 448 U.S. at 407, 100 S.Ct. 2716, the Supreme Court held simply that where the Government is a party to a case, it can waive its own res judicata defense without violating the separation-of-powers principle. But § 26-17A-1 does more than waive the State's own res judicata defense in paternity actions; it clearly applies to numerous cases in which the State is not a party because the mother and child have not received financial assistance from the State. See, e.g., Gann v. Gann, 705 So.2d 509 (Ala.Civ.App.1997) (addressing a paternity challenge by a previously adjudicated father, where the State was not a party); Simmons v. Ellis, 628 So.2d 804, 804 (Ala.Civ.App.1993) (holding that a paternity challenge was barred by the doctrine of res judicata in an action where the State was not a party); Quebedeaux v. Lord, 599 So.2d 51 (Ala.Civ.App. 1992) (holding that the issue of paternity was barred by the doctrine of res judicata in an action where the State was not a party). Indeed, in R.L.T. v. S.V.P., 703 So.2d 1002 (Ala.Civ.App. 1997), the Court of Civil Appeals expressly applied § 26-17A-1 to reopen a paternity judgment in which the State was not a party. Justice Cook cites no authority, nor are we aware of any, that empowers the State to assert or to waive the defense of res judicata on behalf of others in cases to which the State is not a party.

Consequently, Justice Cook's argument, like that of the dissenters in Plaut, 514 U.S. at 255-56, 115 S.Ct. 1447 (Stevens, J., dissenting), depends on a substantial broadening of the precedent of Sioux Nation to exempt from the operation of the separation-of-powers principle remedial legislative measures that do more than waive the Government's own res judicata defense. The majority of the Supreme Court expressly rejected the attempt to broaden the holding of Sioux Nation, concluding:
"[O]ur holding was as narrow as the precedent on which we had relied: `In sum, ... Congress' mere waiver of the res judicata effect of a prior judicial decision rejecting the validity of a legal claim against the United States does not violate the doctrine of separation of powers.'"
Plaut, 514 U.S. at 230-31, 115 S.Ct. 1447 (quoting Sioux Nation, 448 U.S. at 407, 100 S.Ct. 2716).
[13] We note that in K.M. v. G.H., 678 So.2d 1084 (Ala.Civ.App.1995), cert. quashed, 678 So.2d 1084 (Ala.Civ.App.), cert. denied, ___ U.S. ___, 117 S.Ct. 511, 136 L.Ed.2d 401 (1996), the Court of Civil Appeals concluded that § 26-17A-1 did not violate various provisions of the Constitution of Alabama, despite a spirited dissent arguing a separation-of-powers violation, id. at 1089, 1091-97 (Crawley, J., dissenting). This Court's order quashing the writ of certiorari in K.M., like a denial of a writ of certiorari, constituted no expression of approval, on the merits, of the opinion of the Court of Civil Appeals. See generally Ex parte Gentry, 689 So.2d 916, 920 n. 2 (Ala. 1996). Our holding today overrules K.M. to the extent that decision upheld the retroactive application of § 26-17A-1.
[14] Section 27A(b) of the Securities Exchange Act of 1934, the statute struck down by the Supreme Court in Plaut, 514 U.S. at 214-15, 115 S.Ct. 1447, expressly reopened prior final judgments, by providing:

"(b) Effect on dismissed causes of action
"Any private civil action implied under section 78j(b) of this title that was commenced on or before June 19, 1991
"....
"shall be reinstated on motion by the plaintiff not later than 60 days after [§ 27A(b)'s becoming law on] December 19, 1991."
Similarly, § 5 of the 1868 act under consideration in Sanders, 43 Ala. at 177, provided:
"Be it further enacted, That any judgments or decrees rendered since the 25th day of May, 1865, when the original cause of action originated prior to that date, such judgment or decree shall be opened on application as hereinbefore provided, accompanied with an affidavit that such cause of action did originate prior to the 25th day of May, 1865."
[15] Rule 60(b), Ala. R. Civ. P., provides in pertinent part:

"Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc. On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated as intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) no more than four (4) months after the judgment, order, or proceeding was entered or taken."
(Emphasis added.)
[16] Justice Kennedy states that § 26-17A-1 violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States. 723 So.2d at 665 (Kennedy, J., concurring in part and dissenting in part). This broad equal protection argument was not raised by the parties, and we reach no conclusion on the matter. We note, however, that § 26-17A-1's provision of relief for previously adjudicated fathers accommodates the practical difficulties inherent in proving paternity, as contrasted with proving maternity. See Lalli v. Lalli, 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978). Further, we note that the more flexible "reasonable time" requirement we announce today for Rule 60(b)(6), Ala. R. Civ. P., is available to all parties to a paternity judgment.
[17] The statute in question reads:

"§ 26-17A-1. Reopening of paternity case.
"(a) Upon petition of the defendant in a paternity proceeding where the defendant has been declared the legal father, the case shall be reopened if there is scientific evidence presented by the defendant that he is not the father. The court shall admit into evidence any scientific test recognized by the court that has been conducted in accordance with established scientific principles or the court may order a blood test, or a Deoxyribose Nucleic Acid test of the mother, father, and child. Whenever the court orders a test and any of the persons to be tested refuse to submit to the test, the fact shall be disclosed at the trial, unless good cause is shown.
"(b) The test shall be made by a qualified expert approved by the court. The expert may be called by the court or any party as a witness to testify to the test results and shall be subject to cross-examination by the parties. The test results may be admitted into evidence. If more than one test is performed and the results are conflicting, none of the test results shall be admissible as evidence of paternity or nonpaternity.
"(c) Compensation of the expert witness shall be paid by the petitioner.
"(d) In the event the child has been adopted the matter of paternity may not be reopened under this chapter."
This provision is followed by § 26-17A-2, which provides:
"In any decree setting aside an order of paternity pursuant to this chapter, there shall be no claim for damages against the court rendering the initial order of paternity nor any reimbursement or recoupment of money or damages against the mother, the State, or any employee or agent of the State."
(Emphasis added.)
[18] When I use the term "illegitimate" I refer not only to a child born out of wedlock, but also to a child born in wedlock but fathered by a man who is not the mother's husband. See, Leonard v. Leonard, 360 So.2d 710 (Ala.1978).
[19] For example, in Leonard v. Leonard, 360 So.2d 710 (Ala.1978), I dissented because the evidence clearly showed that the children in that case were illegitimate. In Ex parte Presse, 554 So.2d 406 (Ala.1989), I dissented because the evidence clearly showed that the child that was the subject of that proceeding was illegitimate.
[20] The question whether the Legislature has the power to impact the payments and other obligations already fulfilled by the man adjudicated to be the father is not raised in this case. In § 26-17A-2, the Legislature specifically stated that a man who successfully obtains relief from a prior paternity adjudication under § 26-17A-1 may not make a claim for reimbursement or recoupment of money or damages against the mother, the State, or any employee or agent of the State. In other words, § 26-17A-1 cannot affect a prior paternity judgment insofar as it relates to money already paid to and received by the mother, because there can be no reimbursement or recoupment of money from the mother or other damages against her. K.M. v. G.H., 678 So.2d 1084 (Ala.Civ.App.1995), cert. denied, ___ U.S. ___, 117 S.Ct. 511, 136 L.Ed.2d 401 (1996).
[21] Of course, the separation-of-powers decisions of federal courts do not control the application of this principle in cases based on the Alabama Constitution. Because the concept has the same genesis, however, whether applied in the court system of the United States or in the court system of Alabama, decisions of the United States Supreme Court are highly persuasive. See Quinton v. General Motors Corp., 453 Mich. 63, 77-78, 551 N.W.2d 677, 683 (1996).
[22] The Act of February 28, 1877, 19 Stat. 254 ("the 1877 Act"), codified an "agreement" in which the Sioux Nation ceded the Black Hills to the United States. 448 U.S. at 382-83, 100 S.Ct. 2716.
[23] Section 26-17-7 provides:

"Actions commenced under this chapter by the Department of Human Resources shall be in the name of the State of Alabama on relation of the complaining witness or party against the person claimed to be the father or against the person alleged to owe a duty of support as the defendant. In any action brought by the department, the district attorney, special prosecutor, or attorney otherwise authorized to represent the State of Alabama shall appear and prosecute the proceedings brought under this chapter."
(Emphasis added.)
[24] The presumption applies in this case because J.M.B was born within the 300-day, statutory period. See Ala.Code 1975, § 26-17-5(a)(1) ("A man is presumed to be the natural father of a child if ... the child is born during the marriage, or within 300 days after the marriage is terminated by ... divorce").